1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

15

ROGER BOTTS AND CAROL
BOTTS,

    Plaintiffs,

v.

UNITED STATES OF AMERICA,

    Defendant.

CASE NO. C12-1943JLR

ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT

16

17

18

19

20

21

22

## I.    INTRODUCTION

Before the court is Defendant United States of America's ("the Government")

motion for summary judgment under Federal Rule of Civil Procedure 56.  (Mot. (Dkt.

# 45).)  Plaintiffs Roger Botts and Carol Botts bring claims under the Federal Tort Claims

Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80, relating to Mr. Botts' alleged exposure to

asbestos products at Puget Sound Naval Shipyard ("the Shipyard").  (*See generally*

Compl. (Dkt. # 1).)  Having considered the submissions of the parties, the balance of the

1  record, and the relevant law, and having heard oral argument, the court GRANTS the

2  Government's motion for summary judgment.

3                                         **II.    FACTS**

4       **1.  Mr. Botts' visits to the Shipyard**

5       As a truck driver, Mr. Botts, made deliveries to the Shipyard from 1965 to 1980.

6  (Interrog. (Dkt. # 34-2).)  Beginning in 1966, Mr. Botts regularly delivered food to ships

7  and buildings in the Shipyard, and less frequently delivered other supplies.  (Disc. Dep.

8  (Dkt. # 13-22) at 11-14.)  Each delivery involved "10-12 stops" at places such as the

9  galley, hospital, and numerous ships. (Disc. Dep. at 13.)  The parties agree that Mr. Botts'

10 company lost the food delivery contract by March 28, 1971.  (*See* Mot. at 10; Resp. (Dkt.

11 # 48) at 13 n. 6.)  After that, Mr. Botts continued to make deliveries of other items to the

12 Shipyard.  (Perp. Dep. (Dkt. # 13-23) at 19-20, 33.)  These deliveries, however, were

13 typically destined for buildings, not ships.  (*Id.*)  Mr. Botts alternately testified that he

14 made a total of 200-300 deliveries to the Shipyard (Perp. Dep. (Dkt. # 13-23) at 22, 29)

15 and that he delivered food and other supplies to the shipyard twice a week for a period of

16 10 years (Disc. Dep. at 13).

17      When Mr. Botts delivered supplies to ships, he would board the ship to "find the

18 guy in charge" (usually the chief) to sign the paperwork and coordinate unloading.  (Disc.

19 Dep. at 18-19.)  It generally took Mr. Botts from 5 minutes to 30 minutes to find the

20 chief, although sometimes it took up to one hour.  (*Id.*; Perp. Dep. at 45.)  The Navy crew

21 would typically unload the supplies onto the ship, but if the crew was shorthanded, Mr.

22 Botts would help.  (Disc. Dep. at 19-20).

1    Mr. Botts recalled that there was "usually" some kind of construction occurring on

2 the ships he visited.  (Disc. Dep. at 20.)  He thought that the air on the ships was "kind of

3 smoky and dusty."  (Perp. Dep. at 24-25.)  Mr. Botts encountered Navy personnel

4 "working in the corner walls, like the stairways going down below . . . working on pipes

5 or some construction overhead."  (Disc. Dep. at 20.)   He witnessed white insulation

6 material being "wrapped" around pipes "quite a few times."  (Disc. Dep. at 20-21; *see*

7 *also* Perp. Dep. at 24-25.)  He now believes that the material contained asbestos.  (Perp.

8 Dep. at 44.)  Mr. Botts did not, however, see any warning signs specific to asbestos.  (*Id.*

9 at 48.)  Mr. Botts rarely made deliveries to the Shipyard after 1976.  (Disc. Dep. at 24.)

10    **2.  Navy asbestos regulations**

11    Navy issued its first mandatory asbestos control rules for personnel not working

12 directly with asbestos, called NAVMAT P-5100, in March, 1970. (1st Beckett Dec. (Dkt.

13 # 13-1) ¶ 11.)   The March 1970 rules required:

14    (3) Shipboard "ripout" of insulation shall be accomplished in designated
     exclusion areas. Only personnel whose work requires their presence shall
15   be permitted in such areas. All personnel entering such areas shall be made
     aware of the hazards. Ships' force (crewmen) and others accomplishing
16   essential duties in the removal area are required to wear approved
     respirators.

17

18   (4) The area in which removal takes place shall be confined by means of
     curtains, portable partitions, etc. to prevent excessive contamination of
     other areas.

19

     . . .

20

     (9) Dust shall not be exhausted into other working areas.

21

(NAVMAT (Dkt. # 13-8) at 23.)

22

1        In February 1971, the Navy issued NAVSHIPS INSTRUCTION 5100.26, which

2   prescribed certain rules for asbestos fabrication, installation, and removal.  (*See*

3   NAVSHIPS (Dkt. # 13-9).)  With respect to fabrication, the February 1971 rules

4   required:

5           (3)  Asbestos cloth cutting tables or benches provided with adequate local
             exhaust ventilation should be used whenever cutting operations are
6           performed.  Exhaust air containing asbestos dust will not be dispersed into
             the atmosphere without being adequately filtered.

7
             . . .
8
             (8)  Industrial type vacuum cleaners should be used to pick up dusts and
9           scrap. . . . Dry sweeping of scrap or dust should not be permitted.

10  (*Id.* at 3-4.)

11       With respect to installation, the February 1971 rules required:

12          (2) Unpacking and application of insulation materials at the installation site
             will be done in such a manner that will minimize airborne dust.
13
             (3) The area around the installation procedures should be isolated when
14          possible.  Adequate warning signs (enclosure (1)) will be posted.  Only
             persons whose work requires their presence should be permitted in such
15          areas.  If airborne asbestos dust is present, they will wear Bureau of Mines
             approved respirators for dust or leave the area.
16
             . . .
17
             (9)  Decks and spaces contaminated by insulation debris will not be dry
18          swept.

19  (*Id.* at 4-5.)

20       With respect to removal, the February 1971 rules were more permissive than the

21  March 1970 rules in that they only required confinement "when possible."  Specifically,

22  the February 1971 rules required:

ORDER- 4

(3) The area around the Removal procedures should be isolated when possible. Adequate warning signs (enclosure (1)) will be posted. Only persons whose work requires their presence should be permitted in such areas. If airborne asbestos dust is present, they will wear Bureau of Mines approved respirators for dusts or leave the area.

(4) The areas in which asbestos removal takes place will be confined when possible by means of curtains, portable partitions, drop cloths, etc., to prevent excessive contamination of other areas.

(*Id.* at 5.)  The suggested warning signs read:

Restricted Access
Asbestos Installation/Rip Out
Wearing of Respirators Required

(*Id.* at 10.)

In July, 1972, the Navy incorporated asbestos control measures into chapter 9390 of the Naval Ships Technical Manual.  (Tech. Manual (Dkt. # 13-10).)  Regarding installation, the Technical Manual contained language substantially similar to the February 1971 rules.  (*Id.* at 4.)  Regarding removal, the Technical Manual returned to the less permissive language of the March 1970 rules, requiring that:

(3)  The area in which removal takes place shall be confined by means of curtains, portable partitions, etc., to prevent excessive contamination of other areas.

(*Id.*)

In 1973, the Navy issued the BUMED Instruction 6260.14, which was sent to all Navy medical commands, and the OPNAV Instruction 6260.14, which was sent to all naval commands.  (BUMED (Dkt. # 13-12; OPNAV (Dkt. # 13-13).)  These two instructions contained similar requirements regarding warnings, requiring that:

ORDER- 5

Caution signs shall be provided and displayed at each location where airborne concentrations of asbestos fibers may exceed the permissible exposure concentration. Signs shall be posted at such a distance from such a location so that personnel may read the signs and take necessary steps before entering the area marked by the signs.

(BUMED at 5; OPNAV at 7.) The signs were to read:

Abestos
Dust Hazard
Avoid Breaching Dust
Wear Assigned Protective Equipment
Do Not Remain in Area Unless Your Work Requires It
Breathing Asbestos Dust May Be Hazardous to Your Health

(BUMED at 6.)

The parties agree that later incarnations of the Navy's asbestos control rules were materially the same as the Technical Manual with respect to containment of asbestos removal areas. (Mot. at 19; *see generally* MTD (Dkt. # 13).)

### 3. Asbestos at the Shipyard

Plaintiffs provide testimony from five Shipyard insulators and asbestos workers regarding asbestos removal, fabrication, and installation practices at the Shipyard during the 1970s. (*See* Fleshman Dec. (Dkt. # 20) ¶ 2; Eberhard Dec. (Dkt. # 21) ¶¶ 2-3; Leonard Dec. (Dkt. # 22) ¶ 2; Franco Stip. (Dkt. # 25) ¶¶ 2-4; Rathburn Stip. (Dkt. # 26) ¶ 3.) Mr. Rathburn states that in the early 1970s, asbestos work was designated by yellow tape, roping off the work area, and hanging signs in the immediate area. (Rathburn Stip. ¶ 3.) Sometime in 1972, the Shipyard started placing containments made of sheets of herculite (a type of plastic) around asbestos work areas; however, asbestos dust leaked out of these containments. (*Id.* ¶ 5.) Mr. Franco states that asbestos work

1   areas were roped off until 1973, when containers of plastic taped together with duct tape

2   were erected around them.  (Franco Stip. ¶¶ 3-4.)  Mr. Franco was concerned with the

3   level of dust around those areas, because the containments were not fully sealed.  (*Id.*

4   ¶ 5.)  Mr. Leonard does not remember containments being used, but does remember

5   being told to rope off asbestos work areas.  (Leonard Dec. ¶ 3.)

6         Mr. Fleshman states that asbestos work areas were usually roped off, and that he

7   did not observe sealed containments for asbestos removal work until the "latter part of the

8   1970s."  (Fleshman Dec. ¶ 4.)  These containments, made of herculite and tape, did not

9   entirely prevent dust from escaping into the atmosphere.  (*Id.*)  Mr. Fleshman also states

10  that workers cleaned up asbestos work areas by sweeping, rather than vacuuming, the

11  dust.  (*Id.*)

12        Mr. Eberhard states that, when employees worked with asbestos materials in "saw

13  shacks," the shacks grew quite dusty, and employees often opened the door to allow dust

14  to escape into the general atmosphere.  (Eberhard Dec. ¶ 5.)   Mr. Fleshman concurs that

15  workers sometimes opened the doors of saw shacks so that dust could escape.  (Fleshman

16  Dec. ¶ 5.)

17        Mr. Fleshman states that a "significant part" of the new asbestos installation

18  material being installed in the early 1970s contained asbestos.  (Fleshman Dec. ¶ 2; *see*

19  *also* Eberhard Dec. ¶ 3 (stating that the Navy was still using up asbestos-containing

20  insulation in 1976); Leonard Dec. ¶ 2 (stating that he was involved in installation of both

21  asbestos-free and asbestos-containing material).)

22

ORDER- 7

### 4.  Mr. Botts' exposure to asbestos outside the Shipyard

Mr. Botts was diagnosed with mesothelioma in January 10, 2012.  (*See* Interrog. at 47.)  He believes that he was exposed to asbestos at the Shipyard, as well as when he delivered construction materials to and from warehouses and construction sites for various construction contractors, and when he delivered supplies to two paper mills where asbestos materials were used.  (Interrog. at 19; Perp. Dep. at 24, 27-28; Disc. Dep. at 10.)  He estimates that he visited the two paper mills a combined 400 times, and that when he visited the air was dusty from what he now believes is asbestos-containing products.  (Perp. Dep. at 20, 23, 35.)  Mr. Botts has filed asbestos actions in Washington state court against multiple private sector defendants.  *See, e.g.*, *Botts v. EJ Bartells Settlement Trust*, No. 12-2-20284-2 SEA (Wash. Super. Ct., King Cty).

## III.    ANALYSIS

A.    **Legal Standards**

### 1.  Summary Judgment

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where the moving party demonstrates (1) the absence of a genuine issue of material fact and (2) entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of production of showing an absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial, it can show an absence of issue of material fact in two ways:  (1) by producing evidence negating an essential element of the nonmoving

1  party's case, or, (2) showing that the nonmoving party lacks evidence of an essential

2  element of its claim or defense.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,

3  210 F.3d 1099, 1106 (9th Cir. 2000).

4       If the moving party meets its burden of production, the burden shifts to the non-

5  moving party to designate specific facts demonstrating the existence of genuine issues for

6  trial.  *Celotex*, 477 U.S. at 324.  The non-moving party must do more than show there is

7  some "metaphysical doubt" as to the material facts at issue.  *Matsushita Elec. Indus. Co.,*

8  *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The "mere existence of a scintilla

9  of evidence in support of the plaintiff's position will be insufficient; there must be

10  evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty*

11  *Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In determining whether the factfinder could

12  reasonably find in the non-moving party's favor, "the court must draw all reasonable

13  inferences in favor of the nonmoving party, and it may not make credibility

14  determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Products, Inc.*,

15  530 U.S. 133, 150 (2000).  However, a jury "is permitted to draw only those inferences of

16  which the evidence is reasonably susceptible; it may not resort to speculation."  *British*

17  *Airways Bd. v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir. 1978).  If the nonmoving party

18  fails to produce enough evidence to create a genuine issue of material fact, summary

19  judgment for the moving party is proper.  *Nissan Fire*, 210 F.3d at 1106.

20  **2.  FTCA**

21       "The FTCA waives the government's sovereign immunity for tort claims arising

22  out of negligent conduct of government employees acting within the scope of their

ORDER- 9

1  employment." *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008).  Under the

2  FTCA, the government can be sued in "circumstances where the United States, if a

3  private person, would be liable to the claimant in accordance with the law of the place

4  where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  The FTCA is only a

5  partial waiver of sovereign immunity:  the government is exempt from, among other

6  things, liability incurred by a government actor when performing a discretionary

7  function.  28 U.S.C. § 2680(a).  The discretionary function exception does not apply,

8  however, when a "federal statute, regulation, or policy specifically prescribes a course of

9  action" for the government to follow.  *Berkovitz by Berkovitz v. United States*, 486 U.S.

10  531, 536 (1988); *see also O'Toole v. United States*, 295 F.3d 1029, 1033 (9th Cir. 2002).

11      **3.  Washington law:  causation and asbestos**

12      The extent of the United States' liability under the FTCA is governed by reference

13  to substantive state law.  *Molzof v. United States*, 502 U.S. 301, 305 (1992); 28 U.S.C.

14  § 2674; *see also Liebsack v. United States*, 731 F.3d 850, 855 (9th Cir. 2013).  Under

15  Washington law, negligence "requires duty, breach, and resultant injury; and the breach

16  of duty must also be shown to be the proximate cause of the injury."  *Hartley v. State*,

17  698 P.2d 77, 82 (Wash. 1985).  In suits implicating multiple sources of asbestos,

18  Washington courts commonly apply the "substantial factor" test to determine whether

19  exposure to a particular defendant's asbestos products proximately caused the plaintiff's

20  health problems.  *See, e.g.*, *Mavroudis v. Pittsburgh-Corning Corp.*, 935 P.2d 684, 687

21  (Wash. Ct. App. 1997) (noting that "substantial factor causation instructions are

22  commonly given in asbestos-injury cases tried in Washington"); *Lockwood v. AC & S,*

1   *Inc.*, 744 P.2d 605, 623 (Wash. 1987) (instructing jury in asbestos case on the substantial

2   factor causation test).

3        Washington law permits plaintiffs to establish causation through circumstantial

4   evidence. *Berry v. Crown Cork & Seal Co., Inc.*, 14 P.3d 789, 794-95 (Wash. Ct. App.

5   2000).  In asbestos cases, the Washington Supreme Court has identified a number of

6   factors that a trial court should consider when determining if there is sufficient evidence

7   for a jury to find causation due to a particular defendant's products.  *See Lockwood*, 744

8   P.2d 605 at 613.  Specifically, courts should consider (1) plaintiff's proximity to the

9   asbestos product when the exposure occurred, (2) expanse of the work site where

10  asbestos fibers were released, (3) extent of time the plaintiff was exposed to the product,

11  (4) what types of asbestos products the plaintiff was exposed to, (5) how the plaintiff

12  handled and used those products, (6) medical evidence, including expert testimony on the

13  effects of inhalation of asbestos on human health in general and the plaintiff in particular,

14  evidence of any other substances that could have contributed to the plaintiff's disease,

15  and expert testimony as to the combined effect of exposure to all possible sources of the

16  disease. *Lockwood*, 744 P.2d 605 at 613.

17  **B.     Application to Plaintiffs' claims**

18        **1.  Rule violations**

19        Because the discretionary function exception exempts government liability unless

20  a federal regulation or policy specifically prescribes a course of action for the

21  government to follow, liability attaches here only to the extent that the Navy violated one

22  or more of its asbestos control rules.  *See Berkovitz*, 486 U.S. at 536.  For this reason, the

court previously dismissed Plaintiffs' claims based on Mr. Botts' presence at the

Shipyard prior to March, 1970, the advent of the first Navy asbestos control rules

applicable to persons not working with asbestos.  (*See* SMJ Order (Dkt. # 40).)

As this court previously found, viewing the evidence in the light most favorable to

the non-moving party, there exists a material issue of fact as to whether Shipyard

practices from March, 1970 forward consistently adhered to the Navy's asbestos control

rules.  (*See generally id*.)  Specifically, testimony by Shipyard insulators tends to show

that, by merely roping off or marking asbestos removal areas with yellow tape, the

Shipyard did not consistently follow the March 1970, February 1971, and July 1972

requirements that asbestos removal areas shall be "confined by curtains, portable

partitions, etc. to prevent excessive contamination of other areas."[1]  (*See* Leonard Dec.

¶ 3; Franco Stip. ¶ 4; Rathburn Stip. ¶ 3; Fleshman Dec. ¶ 4; NAVMAT at 23;

NAVSHIPS at 5 (requiring confinement "when possible"); Tech. Manual at 4.)

Testimony by insulators Mr. Eberhard and Mr. Fleshman tends to show that, by opening

saw shacks' doors to allow dust to escape into the general atmosphere, the Shipyard may

not have consistently followed the March 1970 and February 1971 rules against

---

[1] The Government maintains that the Navy's use of "drop cloths" at asbestos work areas, without more, satisfies this rule.  (Mot. at 19 n. 13.)  The March 1970 and July 1972 rules do not include drop cloths as a containment option.  (NAVMAT at 23; Tech. Manual at 4.).  Although the February 1971 rules include drop cloths in a list of potential containment options, the court finds no indication in the rules that drop cloths, alone, are necessarily sufficient.  (NAVSHIPS at 5.)  Rather, the rule requires confinement adequate to "prevent excessive contamination of other areas."  (*Id.*)  Plaintiffs produce expert testimony that drop cloths, standing alone, would not meet this standard.  (2d. Heyer Dec. (Dkt. # 51) ¶ 13.)  The question of which practices the Navy, during the 1970s, considered adequate to conform to the asbestos rules appears to be a question of fact.  Accordingly, the court declines to endorse the Navy's interpretation of those rules on summary judgment; at this stage all reasonable inferences must be drawn in the non-moving party's favor.

1  dispersing asbestos exhaust air into other working areas or without adequate filtration,

2  respectively.  (Fleshman Dec. ¶ 5; Eberhard Dec. ¶ 5; NAVMAT at 23; NAVSHIPS at 3-

3  4).  And testimony by Mr. Fleshman that workers swept instead of vacuumed asbestos

4  debris suggests that the Shipyard may not have consistently followed the February 1971

5  rules against dry sweeping.  (Fleshman Dec. at 4.)

6        Finally, Mr. Botts' testimony that he observed what he now believes is asbestos

7  installation being performed[2] raises an issue of fact as to whether the Navy consistently

8  followed (1) the February 1971 rules requiring warning signs at asbestos installation

9  worksites and the 1973 rules requiring signs at locations where asbestos concentrations

10  could exceed a certain level; (2) the February 1971 rules requiring isolation of asbestos

11  installation areas "when possible"; and (3) the February 1971 rules requiring "persons" in

12  asbestos installation areas to wear respirators.  (Disc. Dep. at 20-21; Perp. Dep. at 24-25,

13  45; BUMED at 5; OPNAV at 7; NAVSHIPS at 4-5.)

14        **2.  Causation**

15        The Government argues that Plaintiffs fail to raise specific facts showing that

16  asbestos dust due to rule violations at the Shipyard was a substantial factor in causing Mr.

17  Botts' mesothelioma.  (*See generally* Mot.; Reply (Dkt. # 52).)  The *Lockwood* factors of

18

19  ───────────────

20        [2] The Government points to testimony by Shipyard insulators that warning signs were indeed
    consistently placed around asbestos worksites and urges the court to conclude that because Mr. Botts does
    not recall seeing any warning signs, he must therefore never have encountered any asbestos sites.  (Mot.

21  at 26-27.)  On summary judgment, however, the court is not permitted to weigh the evidence and all
    reasonable inferences must be drawn in Mr. Botts' favor.  *Reeves*, 530 U.S. at 150.  There is evidence
    that, as of 1970, the Shipyard was still installing some asbestos materials.  (*See e.g.*, Fleshman Dec. ¶ 2;

22  Eberhard Dec. ¶ 3; Leonard Dec. ¶ 2.)  Therefore, the Government's argument is unavailing at this stage.

ORDER- 13

1   proximity to exposure, time of exposure, expanse of worksite, type of asbestos product,

2   and medical evidence guide this inquiry. *See* 744 P.2d at 623.

3         The Government points out that the only type of asbestos activity that Mr. Botts

4   claims to have observed during his time at the Shipyard is installation of (what he now

5   believes is) asbestos insulation around pipes.  (Mot. at 24-25, citing Disc. Dep. at 20-21

6   (testimony about insulation being wrapped around pipes; Perp. Dep. at 24-25 (same).)

7   Mr. Botts did not specify when those observations occurred.  (*Id.*)  And Plaintiffs provide

8   no evidence that Mr. Botts was ever in the immediate vicinity of asbestos removal or

9   fabrication.

10        To the contrary, when shown a picture of a fabricator's shop, Mr. Botts did not

11  recall ever seeing a similar situation during his visits to the Shipyard.  (Perp. Dep. at 40;

12  Greif Dec. (Dkt. # 46) Exs. 3 and 4 (photographs of a pipe cover insulator's shop).)  Mr.

13  Botts also testified that he did not remember seeing workers cutting insulation.  (Perp

14  Dep. at 35).  He did not recall seeing workers mixing cement or putty.  (Perp. Dep. at 31-

15  32; 39.)  He did not remember seeing open bags of insulation cement.  (Perp. Dep. at 34

16  ("I don't recall anything being that sloppy.").)  And he did not remember workers

17  operating a bandsaw or sawing insulation in any other way.  (Perp. Dep. at 38.)  Indeed,

18  at oral argument, Plaintiffs' counsel conceded that Mr. Botts never testified that he

19  witnessed asbestos removal.

20        Plaintiffs do not dispute that Mr. Botts' on-ship visits were scaled back after

21  March 1971.  And yet, the asbestos control rules applicable to installation sites did not

22  take effect until February, 1971; these rules concerned warning signs, exclusion areas,

1    and containment "when possible." (*See* NAVSHIPS at 4-5.)  The resulting one-month

2    window is a narrow timeframe in which to prove causation.  The Government concludes

3    that no reasonable factfinder could find that Mr. Botts encountered enough violations of

4    the Navy's asbestos rules such that these encounters played a substantial factor in his

5    development of mesothelioma.  (Mot. at 24-25.)

6          Plaintiffs respond that Mr. Botts did not need to be present at the site of rule

7    violations in order to suffer adverse effects.  In an effort to enlarge the universe of

8    relevant asbestos exposure, Plaintiffs offer expert testimony that effectively expands the

9    zone of proximity.  Dr. Heyer, Plaintiffs' proffered expert in industrial hygiene and

10   epidemiology, opines that "asbestos dust drifts widely throughout ships and shipyards in

11   amounts sufficient to cause mesothelioma well away from the source of the asbestos

12   dust."  (1st Heyer Dec. (Dkt. # 23) ¶ 9).  With respect to asbestos on ships, Dr. Heyer

13   opines that "(a) removal and cleanup aboard military ships in the period [sic] 1970-1975

14   generally produce [sic] far higher concentrations of asbestos dust than the application of

15   new asbestos-containing products, (b) the asbestos concentrations produced by such

16   removal and cleanup may be higher in the general atmosphere around such work than in

17   the breathing zone of the insulators doing the work, and (c) . . . very significant

18   concentrations of asbestos occur in other parts of a large ship well away from where the

19   asbestos removal was occurring."  (2d Heyer Dec. (Dkt. # 51) ¶ 10.)  With respect to

20   asbestos concentrations in shipyards, Dr. Heyer opines that "atmospheric concentrations

21   of asbestos fibers can be tens or hundreds of times greater near where asbestos is

22   occupationally released than in areas where asbestos is present but not being

1  manipulated." (*Id.* ¶ 12.)  He bases this opinion on studies showing increased levels of

2  atmospheric asbestos near plants or factories using asbestos products.  (*Id.*; *see also* 1st

3  Heyer Dec. ¶ 8.)  Mr. Heyer also purports to estimate the amount of asbestos that Mr.

4  Botts was exposed to due to violations of the removal containment rules during his visits

5  to ships from March 1970 to March 1971.  (2d Heyer Dec. ¶¶ 6-8.)

6        The Government points out what it perceives to be several flaws in Mr. Heyer's

7  calculations.[3]  (Reply at 8-9; 2d Beckett Dec. (Dkt. # 52-1) ¶¶ 3-6.)  But the Government

8  has not challenged Mr. Heyer's testimony as inadmissible under the *Daubert* standard,

9  and at summary judgment, the court cannot weigh the evidence.  *See Reeves*, 530 U.S. at

10  150.  Even so, crediting Mr. Heyer's testimony in full, the court concludes that this

11  testimony falls short of creating a genuine issue of material fact.

12        Mr. Heyer's testimony falls short because, under *Lockwood*, proximity is just one

13  factor of several.  Another important factor is extent of time the plaintiff was exposed to

14  the product.  *See Lockwood*, 744 P.2d at 623.  Regarding asbestos encountered on ships:

15  at best, Mr. Heyer's testimony shows that, *if* Mr. Botts entered ships on which asbestos

16  rip-out and removal had occurred or was occurring, it is possible he could have

17  encountered asbestos fibers drifting from the removal area, some of which were caused

18  _____

19        [3] For example, Mr. Heyer relies on dust sample data taken in the immediate area where insulators
20  and pipe coverers were working.  (Reply at 8-9; 2d Beckett Dec. ¶ 3; 2d Heyer Dec. ¶ 6.)  Mr. Heyer does
    not mathematically account for the facts that there is no evidence that Mr. Botts ever present in the
    immediate area of asbestos removal work and that, as shown by the very studies Mr. Heyer cites, asbestos
21  concentrations can decrease with distance from the source.  (Reply at 8-9; 2d Beckett Dec. ¶ 4; *see* 1st
    Heyer Dec. ¶ 6 (quoting a study, with which he "generally agree[s]," showing that asbestos
22  concentrations decreased 70% between two decks of a ship).)

1  by a failure to confine the removal area according to the Navy's rules.[4]  However, the

2  question is not whether such encounters were possible, but whether it is reasonable to

3  infer that such encounters (combined with Mr. Botts' other exposure at the Shipyard, if

4  any) rose to the level of a substantial factor in causing Mr. Botts' mesothelioma.

5         To support the necessary finding that asbestos rip-out in fact had occurred or was

6  occurring on the ships that Mr. Botts boarded, Plaintiffs offer only two pieces of

7  evidence:  (1) a list of ships docked at the Shipyard from 1956 to 1978, the majority of

8  which are marked as undergoing various levels of repair rather than being newly

9  constructed (Resp. at 24, citing Dkt. # 34-1 (Ship List)), and (2) testimony by insulators

10 that they performed both installation and removal work at the Shipyard during the 1970s

11 (Fleshman Dec. ¶ 2; Leonard Dec. ¶ 2).  There is no evidence as to which of the ships on

12 this list underwent asbestos removal.  Plaintiffs attempt to ameliorate this deficiency by

13 asserting that asbestos removal "would logically only be associated with repair work."

14 (Resp. at 24.)  This assertion is unavailing.  Just because removal is associated with repair

15 work does not mean that repair work necessarily involves removal.  The relevant inquiry

16 is the extent to which the listed levels of repair work entail asbestos removal (if at all),

17

18

19  _____

20        [4] Regarding the Navy's other asbestos regulations, the court notes that the violation of or
    adherence to rules regarding signs, isolation areas, and respirators in one area of the ship would not likely
21  affect asbestos levels in other areas of the ship.  And confinement rules regarding installation areas were
    not applicable until one month before Mr. Botts stopped visiting ships frequently (*see* NAVSHIPS at 4).
22  Therefore, the overwhelming majority of Mr. Botts' on-ship exposure to asbestos dust due to rule
    violations would likely be due to rule violations regarding containment of asbestos removal areas.

1    and Plaintiffs fail to provide any evidence on that point.[5]  Moreover, there is no evidence,

2    aside from Mr. Botts' limited recollection, as to which ships on this list Mr. Botts actually

3    boarded.  Aided with a complete list of ships, Mr. Botts was only able to identify two

4    ships (the U.S.S. Constellation and the U.S.S. Sacramento) which he boarded that were

5    berthed at the Shipyard between March 1970 and March 1971.[6]  (Perp. Dep. at 25-26.)

6    Again, there is no evidence as to whether asbestos removal occurred on either of these

7    ships.

8         Without more, any finding concerning the extent of time that Mr. Botts was

9    exposed to asbestos on-ship is speculation.[7]  The "mere existence of a scintilla of

10   evidence in support of the plaintiff's position [is] insufficient; there must be evidence on

11   which the jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  A

12   mere scintilla of evidence is all Plaintiffs have provided here.  Absent some grasp of the

13   extent of time that Mr. Botts was exposed to asbestos fibers on-ship due to rule

14

15   _____

16        [5] The closest Plaintiffs come to supplying evidence on this point is an assertion in their response
     that "repairs typically released asbestos."  (Resp. at 25.)  The source Plaintiffs cite for this assertion is

17   "Rutzick Dec. Ex. 19, p. 292."  (*Id.*)  Neither of Mr. Rutzick's two declarations in this case includes an
     Exhibit 19.  (*See* 1st Rutzick Dec. (Dkt. # 19); 2d Rutzick Dec. (Dkt. # 49).)  Moreover, Mr. Rutzick's

18   first declaration, including exhibits, contains 74 pages, and Mr. Rutzick's second declaration, including
     exhibits, contains 215 pages.  (*Id.*)  The court is not required to comb the record to find some reason to

19   deny a motion for summary judgment.  *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir.
     1988).

20        [6] Four of the ships Mr. Botts identified were berthed at the Shipyard after 1970.  (*See* Ship List).
     These ships docked at the Shipyard multiple times, and it is not clear at which time Mr. Botts visited

21   them.  (*Id.*)

         [7] Mr. Heyer's calculations, without explanation, appear to assume that every ship Mr. Botts

22   boarded was undergoing asbestos removal.

ORDER- 18

1    violations, no factfinder could reasonably conclude that those violations contributed to

2    Mr. Botts' mesothelioma.[8]

3         This flaw also scuttles Plaintiffs' arguments predicated on Mr. Botts' testimony

4    that the ships' air was at times "kind of smoky and dusty."  (Perp. Depo. at 24-25, 114.)

5    Mr. Heyer offers the opinion that "[i]f visible dust is released from asbestos-containing

6    materials, it is often likely that the amount of dust is . . . likely to be in excess of 10 fibers

7    per cubic centimeter ("10 f/cc")[.]"  (2d. Heyer Dec. ¶ 18.)  Assuming it is reasonable to

8    infer that some of the "smoke[] and dust[]" Mr. Botts encountered was due in some part

9    to asbestos-containing material, the record, as discussed above, is still devoid of a

10   connection linking that specific dust with violations of mandatory asbestos rules.

11        Another important *Lockwood* factor is the expanse of the work site where asbestos

12   fibers were released.  *See* 744 P.2d at 613.  Regarding asbestos encountered throughout

13   the Shipyard:  at best, Mr. Heyer's opinion shows that it is possible that Mr. Botts

14   encountered higher asbestos concentrations at the Shipyard than he did in geographic

15   areas that did not handle asbestos products.  This opinion, however, overlooks the fact

16   that only the percentage of Mr. Botts' exposure to asbestos at the Shipyard due to rule

17   _____

18        [8] Moreover, Mr. Heyer's opinion does not fully address the proximity factor.  Mr. Heyer's
     opinion that asbestos concentrations "may be higher" in the "general atmosphere" around asbestos work

19   than in the breathing zone of an insulator doing the work does not explain how asbestos concentrations
     can be expected to vary throughout the compartments and levels of an entire ship.  After all, the very
     same studies that Mr. Heyer quotes in his affidavit show that asbestos concentrations can decrease with

20   distance from the source.  (1st Heyer Dec. ¶ 6 (quoting study showing 70% decrease in asbestos fibers
     two decks away from the source.)  But there is no evidence as to how close Mr. Botts passed to the

21   alleged areas of on-ship asbestos removal.  Mr. Heyer's opinion that concentrations "may be" higher in
     the general area around some kinds of removal work notwithstanding, there is no reasonable basis to find

22   that Mr. Botts encountered such areas frequently enough to cause mesothelioma.

violations is relevant to the causation analysis.[9]  Plaintiffs simply assume that the alleged

rule violations must have increased the net asbestos concentration throughout the

Shipyard by *some* unspecified amount.  But Plaintiffs provide no reasonable basis for a

factfinder to conclude that it is more likely than not that this unspecified amount

contributed to Mr. Botts' mesothelioma.

　　　　After all, the Shipyard covered an area of over 400 acres.  (2d. Beckett Dec. ¶ 7.)

It included a forge and foundry, metal cleaning and paint shops, machine shop, steel

fabrication, wood working, sheet metal and pipe shops, numerous cranes, six dry docks

that could accommodate aircraft carriers, a railroad, steelyards, nuclear repair facilities,

and other work locations at the piers.  (1st Beckett Dec. ¶ 4.)  There is no evidence as to

whether, assuming asbestos fibers from rule violations were distributed evenly, they

would result in an appreciable increase in asbestos concentration throughout the entire

Shipyard.  To the extent that meteorological conditions caused an uneven distribution (as

Mr. Heyer's own citations show is likely), there is no evidence as to where throughout

the Shipyard's 400 acres asbestos from rule violations would drift at any given time, and

there is no evidence as to how frequently Mr. Botts visited areas to which dust from rule

violations had drifted.  (*See* 1st Heyer Dec. ¶ 8 (quoting study stating that consideration

of meteorological conditions is necessary in order to investigate asbestos drift

---

[9] Once again, the court notes that violations of rules that were not intended to reduce the creation
or spread of asbestos dust, such as rules regarding warning signs, exclusion areas, or respirators, would
not have increased asbestos concentrations in other areas of the Shipyard.  Consequently, the
consideration of overall Shipyard asbestos concentration focuses on violations of the Navy's containment,
exhaust, and other housekeeping rules.

ORDER- 20

1   accurately); Mangold Study (Dkt. # 49-3) at 8 (measuring different asbestos

2   concentrations at different locations near the Shipyard).)

3          Moreover, as the summary at the beginning of this order shows, the Navy's

4   asbestos control rules were frequently shifting during the time period in question:

5   between 1970 and 1976, four different sets of rules were promulgated.  (*See generally*

6   NAVSHIPS; NAVMAT; BUMED; OPNAV; Tech. Manual.)  Standard practice one year

7   became a rule violation the next.  (*Compare* NAVSHIPS (no containment of installation)

8   *with* NAVMAT (containment of installation when possible).)  Not only that, but the

9   Navy's rules were not intended to prevent *all* asbestos contamination.  For example, the

10  sets of rules regarding confinement of removal areas only required containments

11  sufficient to "prevent *excessive* contamination of other areas."  (NAVMAT at 23

12  (emphasis added); NAVSHIPS at 5 (same); Technical Manual at 4 (same).)  And

13  containments later used in apparent compliance with these rules allowed significant

14  amounts of dust to escape. (*See* Eberhard Dec. ¶ 5 (expressing concern with amount of

15  dust escaping containments around asbestos work areas); Fleshman Dec. ¶ 5 (same).)

16  Based on the record currently before the court, untangling the extent to which asbestos

17  fibers around the Shipyard were due to violations of these rules amounts to little more

18  than a guessing game.  A jury, however, is not permitted to guess.  *See British Airways*

19  *Bd.*, 585 F.2d at 952 (stating that a jury may only reach "inferences of which the evidence

20  is reasonably susceptible").

21

22

ORDER- 21

Plaintiffs' reliance on Dr. Heyer's citations to studies[10] showing the concentrations of asbestos fibers near shipyards or other sites that used asbestos-containing products is misplaced.  First, studies showing that people living near various sources of asbestos emission can suffer a statistical increase in risk of developing mesothelioma are insufficient to show that someone, such as Mr. Botts, who visited such a site twice a week, suffered a comparable increase in risk.[11]  (*See* 1st Heyer Dec. ¶¶ 8-10; 2d Heyer Dec. ¶ 2.)  Second, the Mangold Study, which shows asbestos concentrations measured downwind from Puget Sound Naval Shipyard in 1982, is too removed in time and circumstance from Mr. Botts' visits to the Shipyard to be of much use to the trier of fact. (Mangold Study at 8.)  At oral argument, Plaintiffs' counsel argued that although the levels of asbestos concentration in the Mangold Study fall below the levels that Dr. Heyer's studies identify as correlating with significantly increased risk, it is reasonable to infer that the levels were much higher in 1970 when Mr. Botts visited the shipyard. Plaintiffs, however, provide a jury with no baseline to judge how *much* higher the concentrations would have been, let alone how much higher they would have been due to rule violations.

---

[10] The court addresses these studies, which Dr. Heyer incorporates in his opinion, because Plaintiffs appear to contend that these studies should be considered evidence in their own right under the ancient documents exception to hearsay.  (*See* 1st Rutzick Dec. (Dkt. # 19) ¶¶ 5-10); 2d Rutzick Dec. (Dkt. # 49) ¶¶ 4-8, 10-11, 15-18).)

[11] Plaintiffs' counsel pointed out at oral argument that these studies show people without any other exposure to asbestos can develop mesothelioma simply from living near sources of asbestos contamination.  However, as Plaintiffs' counsel conceded, Mr. Botts does not claim that the Shipyard is the only source of his exposure to asbestos.

1    As such, any conclusion that Mr. Botts, merely by visiting the Shipyard twice a

2    week, encountered enough asbestos fibers from rule violations to contribute to his

3    development of mesothelioma is sheer speculation.  But to avoid summary judgment, a

4    party must show that a finding in their favor would be "based on more than mere

5    speculation, conjecture, or fantasy."  *O.S.C. Corp. v. Apple Computer, Inc.*, 792 F.2d

6    1464, 1466-67 (9th Cir. 1986) (quoting *Barnes v. Arden Mayfair, Inc.,* 759 F.2d 676, 681

7    (9th Cir.1985)).  Under Plaintiffs' theory, every person who could show, without more,

8    that she periodically visited the Shipyard during the 1970s would have a claim against the

9    Government.  This cannot be.

10    Turning to the final applicable *Lockwood* factor of medical evidence,[12] Plaintiffs

11    offer no evidence regarding the effect of inhalation of asbestos on Mr. Botts personally.

12    Plaintiffs do, however, offer expert testimony by Dr. Brodkin, an expert in occupational

13    and environmental medicine, regarding the effects of inhaling asbestos on human health

14    in general.  Dr. Brodkin opines that mesothelioma is a "dose-response disease." (Brodkin

15    Dec. (Dkt. # 50) ¶ 13.)  In other words, each "'dose' of asbestos is cumulative with newly

16    inhaled fibers added to the burden already present."  (2d Heyer Dec. ¶ 3.)  Although no

17    baseline threshold for development of mesothelioma has been established, Mr. Brodkin

18    opines that higher levels of asbestos exposure result in statistically significant increases in

19    risk.  (Brodkin Dec. ¶ 13.)

20

---

21    [12] Concerning the other two *Lockwood* factors:  the parties have not provided any evidence as to
     the characteristics of the types of asbestos products Mr. Botts may have been exposed to.  Additionally,
22    the parties do not appear to dispute that Mr. Botts did not personally handle any asbestos products at the
     Shipyard.

1    This testimony does not create a material issue of fact.  Plaintiffs identify three

2    scenarios in which Mr. Botts was allegedly exposed to asbestos due to rule violations:

3    (1) witnessing asbestos installation, (2) boarding ships on which asbestos removal had

4    occurred or was occurring, and (3) visiting the Shipyard in general.  As discussed above,

5    the extent of Mr. Botts' exposure during the last two scenarios is purely conjectural.  And

6    the extent of Mr. Botts' exposure during the first situation can only be described as

7    minimal.  No reasonable fact-finder adding the exposure of all three situations together

8    could conclude that it is more likely than not that Mr. Botts' deliveries to the Shipyard

9    constituted a substantial factor in contributing to his mesothelioma.

10    Finally, there are important differences between Plaintiffs' action and the

11    Washington state cases that Plaintiffs rely on.  (*See* Resp. at 6-7.)  As the Supreme Court

12    in *Lockwood* held, "[u]ltimately, the sufficiency of the evidence of causation will depend

13    on the unique circumstances of each case." 744 P.2d at 613.  Mr. Botts' circumstances

14    are unique— none of Plaintiffs' cited cases deal with proximate cause where liability is

15    premised on rule violations.  Moreover, the plaintiffs in the cited cases showed that they

16    were exposed to asbestos for either a greater extent of time or in a closer proximity (or

17    both) than Mr. Botts is able to show.  *See, e.g.*, *Morgan v. Aurora Pump Co.*, 248 P.3d

18    1052, 1058 (Wash. Ct. App. 2011) (plaintiff worked directly with defendant's asbestos

19    products and in the same room as other workers who worked with defendant's products);

20    *Berry v. Crown Cork & Seal Co., Inc.*, 14 P.3d 789, 795 (Wash. Ct. App. 2000) (for five

21    years, plaintiff "worked around insulators who used insulation materials that created

22

1    substantial amounts of [asbestos] dust"); *Lockwood*, 744 P.2d 605 at 611 (plaintiff

2    worked on overhaul of the ship on which defendant's asbestos products were used).

3          Instead, Plaintiffs' claims are more analogous to the claims at issue in *Anderson v.*

4    *Asbestos Corp., Ltd.*, No. 60271-3-I, 2008 WL 3273856 (Wash. Ct. App. 2008),

5    *remanded on other grounds*, 204 P.3d 216 (Wash. 2009).  In *Anderson*, the plaintiff

6    submitted evidence that he worked on ships at Puget Sound Naval Shipyard intermittently

7    over several years, that the defendant's asbestos products were used at the Shipyard

8    during that timeframe, and that he sometimes encountered the defendant's employees

9    working on the ships he visited.  *Id.* at *2-*3.  The court found, however, that "his

10   testimony did not support an inference that he saw [those employees] while they were

11   performing asbestos-related work."  *Id.* at *3.  Dr. Heyer, serving as the plaintiff's expert,

12   opined that asbestos fibers can "travel for long distances in concentrations sufficient to

13   cause disease" and relied on the same studies that he references in this action.  (Heyer

14   Anderson Dec. (Dkt. # 34-3) ¶ 7.)  Nonetheless, the court upheld summary judgment

15   against the plaintiff, finding:  "There is insufficient evidence that [the plaintiff] was ever

16   on a ship at or near the same time as the performance of any asbestos-related work.  And

17   there is no reasonable inference that he was on a ship close enough to the time of any

18   asbestos-related work such that asbestos fibers from the work would still be in the air."

19   *Anderson*, 2008 WL 3273856 at *2.  So too here, there is insufficient evidence as to

20   whether Mr. Botts was ever on ships close enough to the time and place of asbestos rule

21   violations such that asbestos fibers from those violations would still be in the air.

22

ORDER- 25

1    In conclusion, because Plaintiffs fail to raise specific facts demonstrating that Mr.

2  Botts' deliveries to the Shipyard were a substantial factor in causing his mesothelioma,

3  and because the inferences necessary to reach such a conclusion are so many and so great

4  that they can more appropriately be called speculation, summary judgment is appropriate.

5  *See British Airways Bd.*, 585 F.2d at 952 ("[A] jury is permitted to draw only those

6  inferences of which the evidence is reasonably susceptible; it may not resort to

7  speculation.")

8                            **IV.    CONCLUSION**

9    For the foregoing reasons, the court GRANTS the United States' motion for

10  summary judgment (Dkt. # 45).

11    Dated this 20th day of December, 2013.

12

13

14    _____

15    JAMES L. ROBART
     United States District Judge

16

17

18

19

20

21

22